## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**AUNDRA PETERSON,**

> **Petitioner,**

**vs.**                                                    **CASE NO. 4:05cv474-MP/WCS**

**JAMES McDONOUGH,**

> **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

This is a petition for writ of habeas corpus, filed by counsel on behalf of Aundra

Peterson, pursuant to 28 U.S.C. § 2254.  Doc. 2.  Petitioner challenges his conviction

for robbery and trespass in an occupied structure in the Circuit Court of the Second

Judicial Circuit, in and for Leon County, Florida, case number 1999-CF-227A.  The

petition is supported by a memorandum.  Doc. 3.  Respondent filed an answer, doc. 5,

and the record, doc. 6 (paper copy only),[1] and Petitioner filed a traverse, doc. 9.

Respondent concedes that this petition was timely filed.  Doc. 5, p. 3.  Respondent

_____

[1] The state record was not scanned onto the electronic docket.

concedes that state court remedies were exhausted as to grounds one through seven, but contends that state court remedies were not exhausted as to ground eight.

**Section 2254 Standard of Review**

"Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court.  28 U.S.C. §§ 2254(b)(1), (c)."  O'Sullivan v. Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999).  To properly exhaust remedies as required by § 2254(b), "the federal claim must be fairly presented to the state courts."  Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (citing Picard).

If a claim was not fairly presented but is procedurally barred from further state court review,[2] Petitioner must demonstrate cause for the default and actual prejudice, or demonstrate that the constitutional violation has probably resulted in conviction of an innocent person.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).

For claims that were properly exhausted and adjudicated in state court, this court's review is limited.  "[A] determination of a factual issue made by a State court shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1);

---

[2] Procedurally defaulted claims are considered technically exhausted because state court remedies no longer remain "available."  The court therefore refers to "fairly presented" claims as having been properly exhausted, to distinguish them from claims exhausted by procedural default.  See O'Sullivan, 526 U.S. at 848, 119 S.Ct. at 1734.

Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted). Moreover, as to a factual issue adjudicated by the state court, Petitioner must show that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2); 321 F.3d at 1322 (citing the statute). Section 2254(d)(2) is satisfied "only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record." Lomholt v. Iowa, 327 F.3d 748 , 752 (8th Cir. 2003) (citing § 2254(e)(1), other citation omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).  "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court holdings.  Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted); Carey v. Musladin, __ U.S. __, 2006 WL 3542760, *3 (December 11, 2006).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings.  Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495, 1519-1520, 146  L.Ed.2d 389 (2000); Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citing Williams).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if a state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850.

"Avoiding these pitfalls [described in Williams v. Taylor] does not require citation of our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (emphasis in original). Further, "whether a state court's decision was unreasonable must be assessed in light of the record the court had before it." Holland v. Jackson, 542 U.S. 649, 652, 124 S.Ct. 2736, 2738, 159 L.Ed.2d 683 (2004).

The basic law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984). Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850. Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."  Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S. 1204 (2001).  *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing Chandler).  There are no rigid requirements or absolute duty to investigate a particular defense.  Fugate v. Head, 261 F.3d at 1217.

> Indeed, "[c]onsidering the realities of the courtroom, more is not always better.  Stacking defenses can hurt a case.  Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."

*Id.*

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

Although Strickland explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

A state court's adjudication of an ineffective assistance claim does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied Strickland differently. Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122 S.Ct. at 1852. To determine whether the state court's adjudication was an "unreasonable application" of Strickland, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . . Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." Bell, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* Williams). "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Williams v. Taylor, 529 U.S. at 410, 120 S.Ct. at 1522.

**The Trial Evidence**

Dontay Rollins testified that on January 19, 1999,[3] he stopped at Speed's Grocery in Leon County at about 10:30 a.m. Doc. 6, Ex. B (trial transcript), p. 38. He said he intended to use the pay phone to verify that his car insurance payment was due. *Id.*, p. 39. He said he knew Petitioner, but was not a friend, and said that Petitioner was standing there at the telephone. *Id.*, pp. 41, 53. Rollins said he had $270 and his driver's license in the left pocket of his T-shirt. *Id.*, pp. 41-42. He though that the insurance payment was between $240 and $270. *Id.*, p. 56. Rollins said Petitioner came up and asked to "borrow a dollar" and Rollins said no. *Id.*, p. 42. Rollins said he dialed a few numbers and Petitioner struck him in the mouth. *Id.* Rollins said he turned

---

[3] It is judicially noted that June 19, 1999, was a Saturday.

his head, and Petitioner hit him twice in the back of the head.  *Id.*, p. 43.  Rollins said

they then "tussled" and the fight moved to the hood of his car.  *Id.*, pp. 43-44.  Rollins

said his father, Jimmie Williams then came up and struck Petitioner with a walking cane.

*Id.*, pp. 44-45.  Rollins said that Petitioner reached into Rollins's pocket, took the money,

and ran down the sidewalk.  *Id.*, p. 44.

Rollins said that he soon learned that the police had Petitioner at a daycare

center.  *Id.*, p. 46.  He went to the daycare center and saw Petitioner "inside like a little

bathroom-like thing."  *Id.*, p. 47.  There were bushes between the grocery store and the

daycare center and a walking path between them.  *Id.*, p. 48.

Rollins said that when he got his driver's license back, it was "torn and ripped and

kind of crumpled up a little bit."  *Id.*, p. 51.  Rollins said his lip was "busted and swollen."

*Id.*  The police gave the $270 to him.  *Id.*  Rollins said he "screamed" at Petitioner at the

daycare center because he took his money.  *Id.*, p. 70.  This was only a few minutes

after the fight.  *Id.*, p. 71.

Rollins said there were a "lot of" people at the grocery store that day, ten to

fifteen people.  *Id.*, p. 64.  Rollins denied telling Petitioner that he was going to shoot or

kill him, and he said he did not carry a firearm.  *Id.*, p. 65.  Rollins denied that he was a

drug dealer.  *Id.*, p. 66.  He denied that he sold crack cocaine to Petitioner the day

before, or that Petitioner owed him money, and he denied that he was upset with

Petitioner because Petitioner had not paid him the full amount for the crack cocaine.

*Id.*, p. 67.

Jimmie Williams, the father of Rollins, testified that he was at the grocery store

when the incident occurred.  *Id.*, p. 75.  He knew Petitioner, and Petitioner was also

there.  *Id.*, p. 76.  Williams said that he saw his son come up to use the telephone, saw Petitioner approach him, saw Rollins give Petitioner "the dollar," and then saw Petitioner hit Rollins in the mouth.  *Id.*, pp. 77-78.  Williams said he definitely saw Rollins hand a green bill to Petitioner from his front shirt pocket, but he could not say it was a dollar bill.  *Id.*, p. 87.  He said that they were "just tussling" "[s]o finally Peterson comes out of my son's pocket with the money."  *Id.*, p. 77.  Williams said "I saw him take it [the money] away from him [Rollins].  That's why I tried to stop him."  *Id.*, p. 96.  He said he saw Petitioner "fumbling up there in his [Rollins's] pocket and hold onto him."  *Id.*, p. 98.  Williams said he "seen him come out with the money and backs away."  *Id.*, 99.  He said he asked Petitioner what he was doing and where was he going, and Petitioner started to run.  *Id.*, p. 77.  Williams said that Rollins said: "Daddy, he's got my money."  *Id.*, p. 96.  He said that Petitioner ran through the field behind the grocery store toward the daycare center.  *Id.*, pp. 79-80.  Williams noticed on the ground where the fight took place a driver's license and a small black knife.  *Id.*, p. 80.  The license was damaged.  *Id.*  The driver's license was the "soft type."  *Id.*, p. 98.

Williams said that he did not know what Petitioner and Rollins were fighting about.  *Id.*, p. 93.  Williams said the cane belonged to a person sitting next to him, but he denied hitting Petitioner with the cane.  *Id.*  Williams denied having knowledge that Rollins was a drug dealer or that Petitioner owed Rollins money.  *Id.*, pp. 94-9.

Alisa Footman, a teacher at the daycare center, testified that the school was for preschool children, ages three to five.  *Id.*, p. 103.  She said that she saw "this young black guy" jump the school fence into the yard with about 30 children.  *Id.*  The man said he needed to call a ride.  *Id.*, pp. 104, 110.  The man went inside the bathroom and

closed the door.  *Id.*, p. 105.  The bathroom had a door that entered into a classroom. *Id.*, p. 106.  The man did not threaten her.  *Id.*, p. 112.

Scott Beck, a patrol officer with the Tallahassee Police Department, testified he arrived on the scene and Officer Westbrook was talking to Petitioner, who was in the bathroom at the daycare center.  *Id.*, p. 130.  Beck interviewed Rollins, who was also there.  *Id.*, p. 132.  Rollins told Beck that he was "missing" $270.  *Id.*  Beck said that Rollins said he had lost $270 before the $270 was found in the possession of Petitioner. *Id.*, p. 146.  Beck said that Rollins's lip was swollen, and Rollins was given some ice. *Id.*, p. 133.  Rollins was wearing a pullover with a pocket on the front.  *Id.*  His photo ID card was "very wrinkled and bent," and Rollins said that this had just happened.  *Id.*, p. 134.  Beck thought that Rollins still had the ID card in his shirt pocket.  *Id.*, p. 140.

Beck said that after Petitioner was arrested, he asked to speak to Rollins, to apologize, and then yelled "I just asked for a dollar" or "I only asked you for a dollar." *Id.*, pp. 135, 143.  Beck did not notice any bruises on Petitioner.  *Id.*, p. 138.

Curtis Norton, a Tallahassee Police Officer, testified that he searched Petitioner at the daycare center after his arrest and found $270 in cash in Petitioner's right pants pocket.  R. 149.  Norton said Petitioner was inside the bathroom, afraid to come out, "saying someone was trying to kill him . . . ."  *Id.*, p. 151.  He said Petitioner was "real upset."  *Id.*  Norton said that Petitioner "was sweaty, he was smelly, and he appeared to be high or either intoxicated."  *Id.*, p. 153.  Norton said he did not see any bumps, bruises, or scratches on Petitioner needing medical attention, and Petitioner made no such complaints.  *Id.*

The state rested.  *Id.*, p. 157.  Petitioner rested without presenting evidence.  *Id.*, p. 175.

In closing, Petitioner's attorney argued that Petitioner owed money to Rollins.  *Id.*, p. 178.  He argued that when Petitioner encountered Rollins, a fight ensued.  *Id.*  It was argued that Rollins "feels that that money is his because it was owed to him."  *Id.*  He argued that perhaps Rollins's pocket was stretched because Rollins was trying to take the money from Petitioner.  *Id.*, pp. 198-199.

Counsel also argued about inconsistencies in the testimony of the witnesses, and the lack of clear memory, pointing out that the father of Rollins testified that Rollins and Petitioner were in different positions than Rollins had said.  *Id.*, p. 180.  He pointed out that Williams denied hitting Petitioner with a cane.  *Id.*  He argued that Rollins and Williams concocted their stories to get Petitioner's money.  *Id.*  He notes that neither Rollins nor Williams called the police, but instead, chased Petitioner.  *Id.*, p. 181.  He pointed out that Williams had pending felony charges.  *Id.*, p. 183.  He noted that Petitioner was afraid in the bathroom, that he thought someone was after him to kill him.  *Id.*  Finally he emphasized that Petitioner cooperated with the police and gave them his identity.  *Id.*, p. 184.

**The Rule 3.850 Evidentiary Hearing**

At the Rule 3.850 evidentiary hearing, Kalisha Brown testified that Petitioner is her husband.  Doc. 6, Ex. H, p. 7.  She said she was not married to him on the date of the incident, January 19, 1999.  *Id.*  She said that prior to January 19, 1999, Petitioner had a confrontation with Rollins.  *Id.*  Rollins was in one yard, and Petitioner was in another yard.  *Id.*, p. 8.  She said Rollins argued with Petitioner, and then said he was

going inside to get his gun, so she and Petitioner left.  *Id.*,p. 9.  Brown said she told

Petitioner's attorneys[4] about this incident.  *Id.*, p. 11.

James Morgan testified that in January, 1999, he knew that Petitioner had a drug

problem.  *Id.*, p. 13.  Morgan said that at about 3:00 a.m. on January 19, 1999,

Petitioner came to his house.  *Id.*, pp. 14-15.  He said that he saw Petitioner snort

cocaine at that time.  *Id.*, p. 18.  Morgan thought that Petitioner was "hitting the powder,"

meaning cocaine.  *Id.*, p. 15.  Morgan's house is two blocks from the grocery store.  *Id.*

Morgan said Petitioner was "very much high on drugs."  *Id.*, p. 16.  Morgan said

Petitioner was "very different" from when he was not high on drugs.  *Id.*, p. 17.  Morgan

said that Rollins had a reputation in the community as a drug dealer.  *Id.*, p. 21.

Petitioner testified that he informed his attorney that he was intoxicated at the

time of the offense, and he said he also told his attorney that he had a history of

substance abuse.  Doc. 6, Ex. H, pp. 23-24.  He testified that the night before the

offense, he was high on cocaine, crack cocaine, and alcohol, and was very intoxicated.

*Id.*, pp. 25-26.  He said he talked with his trial attorney only one time before trial.  *Id.*, p.

26.  He said his attorney did not tell him about the defense of voluntary intoxication.  *Id.*

He said his attorney asked him to relate what he thought his defenses were.  *Id.*

Petitioner said that at the time of the offense he was homeless, without a place to stay,

and he was staying in a house with other drug abusers with permission of Jimmy

Morgan.  *Id.*, pp. 24-25.

---

[4] Petitioner was represented by Leonard Holton and then by Robert A. Morris.

Petitioner said he went to the grocery store because he could perhaps get drugs or money given to him there. *Id.*, p. 29. He said he saw Rollins using the telephone and asked for a dollar because he was hungry. *Id.* Rollins told him no. *Id.*, p. 30. Petitioner said he had been buying drugs from Rollins for two months. *Id.* He said he had seen money in Rollins's top pocket, and when Rollins said no, "anger arose in me and fear." *Id.* He said his mind went "out of control like a lot of different ways." *Id.* He said he pondered whether to take the money, and then he pulled Rollins's shorts down, and as Rollins bent to pull them back up, he grabbed the money from Rollins's pocket. *Id.* He said Rollins demanded his money back. *Id.*, p. 31. He denied hitting Rollins before taking the money. *Id.*, p. 32. Rollins then fought with Petitioner, trying to get the money back. *Id.* Williams came up, left briefly, came back with a cane, but could not hit Petitioner because he would hit his son. *Id.*, pp. 32-33. Petitioner said he broke free after hitting Rollins, and Rollins said he would kill him. *Id.*, p. 33. Petitioner said he had been buying drugs from Rollins for a while, and Rollins had a reputation for violence. *Id.*, p. 36. When Rollins went to his car, Petitioner "took off running." *Id.*, p. 37. He said he thought he was running for his life. *Id.* Petitioner said he hid behind a white house, and could see Rollins in his car, circling the block. *Id.* He said he saw the daycare center, with children and adults, and he reasoned that Rollins would not kill him in front of witnesses, so he ran to the daycare center and "asked them to call a ride." *Id.*, p. 38. He said that he then asked someone there to call the police. *Id.* Petitioner said he made these requests from outside the fence, but when the adults took the children in, he reasoned that he no longer had witnesses, so he jumped the fence and went into the bathroom. *Id.*, p. 39. Petitioner said that he was intoxicated, and the whole time he

could not keep still, felt like he was outside his body, was numb and could not feel himself.  *Id.*

Petitioner admitted that he had been convicted of felonies ten times.  *Id.*, p. 40.  He said he took the money from Rollins "to feed my drug habit."  *Id.*, p. 41.  Petitioner admitted that when questioned by the police, he told them that the money was his.  *Id.*, pp. 44-45.

Petitioner said that he did not trust his attorney, Robert A. Morris, and he said that he and Morris went over the police report, which contained his untruthful version as to who owned the money.  *Id.*, p. 46.  Petitioner admitted that in this way he "told" Morris the same untruthful story as he told the police.  *Id.*  He said he met with Morris only once, and Morris asked him what he thought his defenses were.  *Id.*, pp. 50-51.

Petitioner said he knew he had a right to testify at his trial.  *Id.*, pp. 45-46.  He said that his attorney asked him if he wished to testify after the state rested its case.  *Id.*, p. 51.  He told Morris and the trial judge "no."  *Id.*  He said that his attorney told him that if he testified at this trial, the fact that he had been convicted of robberies before this incident would come into evidence.  *Id.*, p. 46.  He said that had he testified, he would have admitted that the money was owned by Rollins and that he hit Rollins once to avoid being hit by Williams with the cane.  *Id.*, p. 49.  Petitioner said that because he did not want to be represented by Morris, he would have testified that the money was owned by Rollins without first telling Morris that his testimony would be different from what he had told the police.  *Id.*

Finally, Petitioner said he told his attorney about his wife, Kalisha Brown, Patrick Griffin, and Melvin Young, who might be witnesses.  *Id.*, pp. 48-49.

Robert A. Morris testified that he had been practicing criminal law since September, 1998. *Id.*, p. 53. He said he had tried 15 to 20 life felonies by the time he represented Petitioner. *Id.*, p. 54.

Morris said:

> Mr. Peterson was relatively belligerent toward me throughout the course of my representation. And it rose to such a degree of belligerence after the trial and during the pendency of his second case [see ahead] that I wound up withdrawing. So in terms of a discussion, I certainly tried to obtain the facts and ascertain what his view of the defense would be. But an ongoing dialogue, I can't say that that ever existed.

*Id.*, p. 58. Morris said that after Petitioner bonded out on these charges, he "vanished from the face of the earth in terms of having any concern about his case whatsoever. Not until Mr. Peterson was rearrested in, I believe, January, did the case again become a concern to Mr. Peterson." *Id.*, p. 82. Morris said: "Mr. Peterson was arrested a month or two after his release [on bond] for an aggravated assault with a deadly weapon at the Shell Station at the corner of Capital Circle and Apalachee Parkway." *Id.*, p. 68. Communication was so bad, said Morris, that a month or so after this trial, Morris withdrew as Petitioner's lawyer. *Id.*, p. 75.

Morris said his recollection of Petitioner's position was that the money was his. *Id.*, p. 58. He said that "as put forth by Mr. Peterson, . . . it was essentially a drug deal gone bad." *Id.*, p. 60. The theory was that the money was Petitioner's money, but Rollins thought Petitioner owed him that money and tried to get it. *Id.*, p. 86. It was Petitioner's position (as told to Morris) that Rollins and Williams were liars, that Williams had pending charges, and that both Rollins and Williams "concocted a story to extort money from Mr. Peterson and basically get their money and go on their merry way." *Id.*,

pp. 63-64.  Morris said: "[H]is statement to me was, my defense is what is in the police reports.  Go read it and I don't need to see you again."  *Id.*, p. 82.  Morris admitted that the only evidence he had to support this defense was from Petitioner.  *Id.*, p. 78.  When Petitioner did not testify, Morris admitted he was left with no evidence of this theory.  *Id.*, p 79.

Morris said that Petitioner's prior attorney, Leonard Holton, had taken depositions of the law enforcement officers and the victim.  *Id.*, p. 55.  Morris said he met with Petitioner four or five times at the jail, to discuss the case and obtain his version of the facts.  *Id.*  He talked with the prosecutor, Christopher Canova, to see if a plea agreement was possible.  *Id.*  Morris said he hired a private investigator, who interviewed witnesses.  *Id.*

Morris said he was unable to depose or interview the victim's father, James Williams, because he "remained at large" and was not found and arrested on another charge until the Sunday before the trial.  *Id.*, p. 56.  Morris denied that Petitioner had mentioned any witnesses to him.  *Id.*

Morris said he knew that voluntary intoxication was a defense to the robbery charge.  *Id.*, p. 59..  He said that Petitioner did not indicate that he was intoxicated to the extent that it would rise to the level of a viable defense or was even an issue.  *Id.*, pp. 60-61, 59.  Morris said he did know, from a reference in the deposition of Rollins, that Petitioner was a drug user.  *Id.*, p. 60.  There was no mention of intoxication or drugs in the police reports.  *Id.*  He said that the first he learned of this possible defense was when one of the witnesses described Petitioner's demeanor at arrest, when Norton said Petitioner appeared to be intoxicated.  *Id.*, p. 59.  He said that he got an answer he "was

not prepared to get." *Id.*  Morris said that that "was the very first instance of communication by anyone to me in the case that that issue may have been somewhere involved in the case." *Id.*, pp. 59-60.

Morris said that after the evidence of intoxication came in, he did not ask for a jury instruction on the defense because his success rate with the voluntary intoxication defense "when it was viable in Florida was nil." *Id.*, p. 76.  He also felt that he had the burden of proving the level of intoxication.  *Id.*  He said:

> I think that the defense is a crummy defense.  I don't like using it.  It has never worked for me in the past and considering the facts that were played in this case, quite frankly, it was not a consideration as to whether it should be used or not.

*Id.*, p. 77.  He said "I can't say it [the defense] was even considered.  And the reason that I can't say that is because I don't think that the facts supported its consideration." *Id.*  Morris said that the defense "does not sit well with the jury." *Id.*, p. 92.

Morris said that Kalisha Brown was Petitioner's girl friend at that time. *Id.*, p. 61. He had contact with Brown about bond issues.  *Id.*  Morris said: "I still to this day would have no earthly idea what Kalisha Brown would add to the mix." *Id.*  He said Brown never told him that on an earlier occasion, Rollins became angry at Petitioner for selling drugs in a yard adjacent to Rollins's residence or threatening Petitioner with a gun. *Id.*, p. 62.

Morris had no notes in his file relating to Melvin Young or Patrick Griffin. *Id.*, p. 62.  He thought it was 99.9% sure he would have had notes if those had been mentioned as possible witnesses. *Id.*, p. 63.

Morris said that his notes indicated that he spoke to potential witnesses Footman and Hargrett.  *Id.*, p. 71.  He was prepared to cross examine them.  *Id.*

Morris said he did not talk with Officer Norton.  *Id.*, p. 71.  He said that Petitioner wanted his statements to the police to "serve as his testimony in the trial."  *Id.*

Morris said he did not call Officer Westbrook because he thought his testimony would only be damaging.  *Id.*, p. 79, 63.  He said that Petitioner made a statement against interest to Westbrook, and he would cause that to come into evidence if he called Westbrook as a witness.  *Id.*, p. 80.  He thought that Westbrook's testimony was mostly inadmissible hearsay and of very little value.  *Id.*, p. 79.  Finally, Morris thought that by trying to get Petitioner's statements to Westbrook in through Westbrook, he would open the door to impeachment of Petitioner by admission of his prior convictions. *Id.*, pp. 81.

With respect to a jury charge on the lesser included offense of battery, Morris said he researched the law, but he did not "particularly want to give the jury an opportunity to compromise.  Either Mr. Rollins was a liar or he wasn't.  The jury needed to fish or cut bait in my mind."  *Id.*, p. 65.  Morris placed in evidence the cases he had in his file showing his research.  *Id.*, p. 84.  Morris said that his research showed that a battery conviction would result in a minimum mandatory five year term because Petitioner would be sentenced as a prison releasee reoffender, and he had been offered a plea to a five year term, so he did not want to "pigeonhole him to that [a five year term] through jury instructions."  *Id.*, pp. 65-66.  "Instead, I wound up asking for the petty theft lesser included, which made sense.  That would free him up from the prison release reoffender issue."  *Id.*, p. 66.

When asked why he did not raise the defense of necessity to the trespass charge, Morris said that there are "very, very few cases that I can think of that the defense of necessity would be appropriate and applicable." *Id.*, p. 67. He did not think it applied to Petitioner. *Id.* He explained: "Quite honestly, the trespass charge was the least of Mr. Peterson's worries." *Id.*

Morris said that the record reflects that he told the court that he had discussed with Petitioner his right to testify. *Id.*, p. 68. He said that while he had no independent recollection, it was his routine in every case to discuss the right to testify, to explain the positives and negatives, and to tell the client that the decision was his to make. *Id.*, pp. 68-69. He said he would "live with" whatever decision his client made. *Id.*, p. 69. Morris said that he would have advised Petitioner not to testify due to his criminal history. *Id.*

Morris said there was nothing to support a self-defense theory. *Id.*, p. 72. There were no abrasions or bruises on Petitioner. *Id.* He said that the defense was a drug deal gone bad resulting in a shoving match, and a self-defense theory did not support the theory that Rollins was lying. *Id.* Morris also pointed out that if Petitioner did not testify, the jury was left with evidence of injuries (only to Rollins) and damaged clothing (Rollins said the money had been in his pocket and his pocket was torn or stretched). *Id.*, p. 88. Morris also reasoned that self-defense and the defense of voluntary intoxication were inconsistent, and it was his belief that he needed to maintain credibility with the jury, "to keep things streamlined" and not throw "bits and pieces at a jury." *Id.*, p. 89.

Morris said that when he made his opening statement, and offered the theory that this was a case of a drug deal gone bad, he did not know if Petitioner would testify. *Id.*, p. 74. He pointed out that Petitioner had little or no defense to begin with. *Id.*, pp. 74 and 88. When the case began, Morris still did not know how it would unfold. *Id.*, p. 76.

**Ground One**

Petitioner contends that he was deprived of effective assistance of counsel because his attorney did not advise him that voluntary intoxication is a defense to the charge of robbery. He contends that his attorney should have discovered that he was intoxicated when he committed the robbery, and should have called James Morgan as a witness to establish this defense. Further, he contends his attorney was ineffective for failing to request a jury instruction on the defense of voluntary intoxication.

In Florida:

 (1) "Robbery" means the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear.

FLA. STAT. § 812.13(1). Voluntary intoxication was a defense on January 19, 1999, since specific intent to deprive the person of the property is an element of the offense.[5] Thomas v. State, 734 So.2d 1138 (Fla. 1st DCA 1999); Parrish v. State, 892 So. 2d 1199, 1200 (Fla. 4th DCA 2005). The evidence of intoxication must show "inability to form the requisite specific intent." Reaves v. State, 942 So. 2d 874, 879 (Fla. 2006).

---

[5] The defense of voluntary intoxication was abolished for all offenses effective October 1, 1999. FLA. STAT. § 775.051, Ch. 99-174, § 1, Laws of "Florida (1999).

The trial court held an evidentiary hearing and rejected the claim, making the

following findings:

> In ground one (1), the defense asserts that Mr. Morris was ineffective in
> reference to the voluntary intoxication defense.  The Court accepts the
> testimony of Mr. Morris that Mr. Peterson never mentioned to him that he
> was intoxicated at the time of the crime.  In making this finding, the
> Court specifically rejects the defendant's testimony to the contrary.  *This
> instance is an example of a situation that overlays all of Mr. Morris'
> dealings with this defendant.  Mr. Morris was dealing with an
> uncooperative client that chose to lie to his attorney.*  Under these
> circumstances, Mr. Morris did the best he could to represent his client.
> According to Mr. Morris' unrebutted testimony (except the defendant),
> there was no indication prior to trial that voluntary intoxication was a viable
> defense.  Therefore, based on the information provided by his client and
> based on his investigation of the case, a strategy decision was made to
> pursue a theory that this was a drug deal gone bad and to attack the
> credibility of the state's two key witnesses, Dontay Rollins and Jimmie
> Williams.  At trial there were serious inconsistencies between these two
> witnesses which were exploited by the defense.  In conjunction with this
> attack, Mr. Morris also pointed out the lack of investigation by the police.
> Although this strategy did not prevail, it was not an unreasonable strategy
> and Mr. Morris was not deficient for pursuing this strategy.  The defense
> has also failed to show any likelihood that a voluntary intoxication defense
> would have succeeded at trial.  Therefore, the defendant has failed to
> show any prejudice.

Doc. 6, Ex. G, Order Denying Rule 3.850 Motion, ¶ 2 (emphasis added).[6]

Petitioner has not rebutted the factual findings set forth above "by clear and

convincing evidence."[7]  28 U.S.C. § 2254(e)(1).  Morris did his best with an

uncooperative client who lied to him about the central feature of the case, which was

---

[6] Respondent has cited to the stamped pages of the state record.  However, the
record pages are illegible on most of this copy of Exhibit G and I have not referred to
them.

[7] Petitioner argues that the court should find Petitioner was more credible than
Morris.  Doc. 3, p. 5.  As explained above, the court cannot make credibility findings.

who owned the money.  With admittedly little evidence, counsel did his best to confuse

the jury with a tale of a drug deal gone bad.

That counsel did not ask Petitioner whether he was intoxicated, under these

circumstances, was not attorney error.  <u>Strickland</u> cautioned:

> The reasonableness of counsel's actions may be determined or
> substantially influenced by the defendant's own statements or actions.
> Counsel's actions are usually based, quite properly, on informed strategic
> choices made by the defendant and on information supplied by the
> defendant.  In particular, what investigation decisions are reasonable
> depends critically on such information.  For example, when the facts that
> support a certain potential line of defense are generally known to counsel
> because of what the defendant has said, the need for further investigation
> may be considerably diminished or eliminated altogether.  And when a
> defendant has given counsel reason to believe that pursuing certain
> investigations would be fruitless or even harmful, counsel's failure to
> pursue those investigations may not later be challenged as unreasonable.

<u>Strickland</u>, 466 U.S. at 691, 104 S.Ct. at 2066.  While it may be argued that defense

counsel should usually ask the defendant whether he or she was intoxicated when the

offense was committed, in this case counsel made a reasonable decision that further

investigation was unnecessary.  The offense was committed at 10:30 in the morning,

which could reasonably be thought too early, absent information to the contrary, to

assume that someone was intoxicated.  Counsel cannot be expected to explore a

confession and avoidance defense when his client insists he is innocent, does not

mention intoxication, and, through a lack of cooperation, tells counsel to find his defense

in the police reports.

Moreover, voluntary intoxication was a weak defense.  Counsel reasonably did

not pursue a jury instruction for strategic reasons (despite the evidence that slipped in

through the testimony of Officer Norton) because he did not want to weaken his primary argument.

Practically speaking, a defendant must be nearly comatose to erase all consciousness of intention.  That plainly was not this case.  The following is collected from Petitioner's testimony at the Rule 3.850 hearing and the testimony of Rollins at trial.  Petitioner asked for a dollar from Rollins but was rebuffed.  Petitioner then saw more money in Rollins's pocket.  Petitioner had the capacity to see his opportunity, pull Rollins's shorts down (according to Petitioner) or hit Rollins in the face (according to Rollins), grab the money, fight with Rollins to keep the money, hit Rollins to avoid being hit with a cane by Williams (according to Petitioner), run to try to avoid prosecution, ask the daycare center staff for help in getting a ride, hide in a bathroom to protect himself from the wrath of Rollins, and acknowledge guilt as he was taken away by trying to offer an apology to Rollins.  Further, at the end of these actions, Petitioner was in possession of sufficient reasoning capacity to offer an exculpatory reason for his behavior, that to begin with he just wanted a dollar.  *See*, Reaves, 942 So. 2d at 879 (where a defendant made "statements indicating he knew exactly what he was doing" at the time of the offense, the defense of involuntary intoxication is negated).  This was not the behavior of someone so intoxicated that he could not form the intent to steal and how to steal. Had the defense been argued, the jury would have concluded that while intoxication probably diminished Petitioner's inhibitions, Petitioner knew he was trying to take the money to permanently deprive Rollins of it.  Petitioner said as much at the Rule 3.850 hearing when he admitted he wanted the money to buy drugs for himself.  Pursuit of this

weak defense of intoxication would have negated the arguments of a drug deal gone wrong and the attempts to undermine the credibility of Rollins and Williams.

For the same reasons, it was not error to have failed to call James Morgan to testify to the drugs and alcohol that Petitioner had ingested.  Morgan did not provide clear evidence of the extent of Petitioner's alleged impairment.  Petitioner's words and actions were stronger evidence of his ability to think clearly, despite his inebriation.

Thus, neither attorney error nor prejudice to the outcome has been shown. Consequently, Petitioner has not shown that the state court's adjudication of the merits of Petitioner's ineffectiveness claim in ground one has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Two**

Petitioner asserts that his attorney was ineffective for failing to call Melvin Young, Patrick Griffin, Scott Westbrook, and Kalisha Brown as witnesses.  Doc. 2, p. 9 (on the electronic docket).  He contends that these witnesses would have proved that a robbery was not committed because the only force used was when Rollins assaulted Petitioner after Petitioner grabbed the money.  Petitioner argues that with this testimony, the jury would have convicted him of a lesser included offense.  *Id.*  In Petitioner's memorandum, however, Petitioner only argues ineffectiveness for failing to call Westbrook and Brown as witnesses, and does not mention Young or Griffin.  Doc. 3, pp. 8-11.  The state court only addressed the failure to call Westbrook and Brown as witnesses, doc. 6, Ex. G, ¶ 3, and this report and recommendation will do the same.

Petitioner argues that if called as a witness, Westbrook would have said that Petitioner told him that he "was supposed to be conducting a drug deal where this man [Rollins] was going to give him [Petitioner] some money, and he [Petitioner] would deliver the drugs later to him."  Doc. 3, Ex. 1, p. 18.  Petitioner cites the wrong testimony.  After so testifying in his deposition, Westbrook refreshed his memory by looking at his report and he corrected this; he said that Petitioner had said that he had been at the grocery store trying to buy drugs from Rollins, and Rollins wanted Petitioner to give him the money then and he would return later with the drugs for Petitioner.  *Id.*, pp. 19-20.  Petitioner said that when he refused to hand over the money to Rollins, Rollins "started to attack him" and an older person came up and hit him with a cane.  *Id.*, p. 20.  Petitioner argues that this would have been admissible pursuant to the rule of completeness, to complete all of Petitioner's hearsay statements at the time of his arrest.  Westbrook also said that Petitioner "did have a couple of bruises on his face that appeared to be new," testimony that was not hearsay.  *Id.*

Petitioner contends that Kalisha Brown would have testified that a few months before, Rollins threatened to kill Petitioner.  In response to a leading question during the Rule 3.850 hearing, Morris said Brown never told him that on an earlier occasion, Rollins became angry at Petitioner for selling drugs in a yard adjacent to Rollins's residence or that Rollins threatened Petitioner with a gun.  Doc. 6, Ex. B, p. 62.

The Rule 3.850 court rejected this claim.  Doc. 6, Ex. G, ¶ 3.  The court found that testimony from Westbrook as to Petitioner's self-serving hearsay statements would not have been admissible.  *Id.*  The court also reasoned that even if those statements had been admitted into evidence, the prosecution might have impeached the

statements by introducing Petitioner's many felony convictions.  *Id.*  The court found

these to be supportive of a reasonable strategic decision not to call Westbrook.  *Id.*  The

court did not mention the evidence from Westbrook that Petitioner had some bruises

and abrasions.  The court noted that Morris said he talked with Kalisha Brown, but she

did not offer any evidence useful to the defense.  *Id*.  The court also reasoned that the

new information from Brown, that Petitioner had been in an altercation with Rollins a few

months before, would not have changed the outcome.  *Id.*

Although the trial court ruled that Petitioner's statements to Westbrook would not

have been allowed into evidence, Petitioner has shown that Florida law permits such

hearsay statements to come into evidence so that the jury has all of Petitioner's

statements, not just excerpts that favor the prosecution.  Christopher v. State, 583 So.

2d 642, 646 (Fla. 1991) ("When the state offers in evidence a part of a confession or

admission against interest, the defendant is entitled to bring out on cross-examination

the entire confession or admission.").  The rule, said the court, applies equally to

"related conversations."  *Id.*  All of the things that Petitioner told the several arresting

officers were "related conversations."  They occurred at the same time and all were

related to Petitioner's explanation of what had happened.  It is presumed that the trial

court would have correctly ruled and allowed all of Petitioner's statements into evidence

had Petitioner's lawyer brought Christopher to the attention of the court.

In any event, none of this testimony would have changed the outcome.  The

problem was with Petitioner himself.  At the time of his arrest, Petitioner told Westbrook

that it was his own money brought to a drug deal with Rollins, but as he was taken away

after the arrest, Petitioner tried to apologize to Rollins and then yelled out, in self-

justification, that he was only asking for one dollar.  In other words, Petitioner's "drug deal gone bad" story was negated by Petitioner himself immediately after his arrest. Petitioner then refused to cooperate with Morris, telling him to defend him from the evidence in the police reports.  That left Morris with little indeed.  Morris did his best with Petitioner's own unbelievable defense, but having Westbrook testify as to what Petitioner said about a drug deal gone bad would have not been believed at all by the jury.

It is true that Westbrook would have testified that Petitioner "did have a couple of bruises on his face that appeared to be new."  Doc. 3, Ex. 1, deposition of Westbrook, p. 20.  That this evidence was not presented, however, does not undermine the court's confidence in the outcome.  Rollins had a swollen lip, entirely consistent with his testimony and that of Williams that Petitioner punched Rollins in the face.  There was undisputed evidence of a scuffle between Petitioner and Rollins from the testimony of Rollins and Williams.  Petitioner himself, in his Rule 3.850 testimony, acknowledged that there was a scuffle.  That Petitioner had "a couple of bruises on his face that appeared to be new" would not have been especially strong evidence to support the theory that Petitioner did not use force upon Rollins to steal the money.

The testimony from Kalisha Brown would have hurt Petitioner's defense more than it might have helped.  It would have shown Petitioner to be a drug dealer.  Further, it was remote in time and it did not undercut the testimony that after his arrest, Petitioner had first wanted to apologize to Rollins and then tried to justify himself to Rollins by saying that he had "just asked for a dollar."

In summary, none of ground two is persuasive.  Neither attorney error nor prejudice to the outcome has been shown.  Thus, Petitioner has not shown that the state court's adjudication of the merits of Petitioner's ineffectiveness claim in ground two has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Three**

Petitioner alleges that his counsel was ineffective for failing to request a jury instruction on a lesser included offense of battery.  Petitioner admits that battery is not listed as a lesser included offense to robbery in the Standard Jury Instructions in Criminal Cases, 723 So. 2d 123 (Fla. 1998), but argues that he might have been convicted of third degree felony battery, given his record, rather than the second degree felony of robbery.  Doc. 2, pp. 11-12.

In his memorandum, Petitioner argues that battery was a permissive lesser included offense, citing Maldanado v. State, 691 So. 2d 61, 61 (Fla. 3d DCA 1997) (error not to charge "resisting a merchant" as a lesser included offense of strong-arm robbery) and Baker v. State, 578 So. 2d 37, 38-39 (Fla. 4th DCA 1991) (permissible to instruct on battery as a lesser included offense of robbery where the information charged that bodily harm had been caused and there was evidence of bodily harm).[8] Doc. 3, p. 11.  Petitioner states that because he had previously been convicted of at a

---

[8] The information originally charged felony battery as count two.  Doc. 6, Ex. A, R. 4 (the record pagination is legible at this point in Ex. A).  That charge was dropped. *Id.*, R. 11, 12.  The robbery count alleged that Petitioner used "force, violence, assault, or putting in fear."  *Id.*, R. 11.

battery, he would have been subjected to a third degree felony battery conviction pursuant to FLA. STAT. § 784.03(2).[9]  *Id.*, p. 12.  For that offense he would have faced a sentence not to exceed five years in prison.  FLA. STAT. § 775.082(3)(d).

The state court rejected this claim.  The court found that Morris was aware of the availability of this jury instruction.  Doc. 6, Ex. G, ¶ 4.  The court reasoned that Morris made a strategic decision not to pursue a conviction for a third degree felony battery because:  "Had a jury convicted defendant of a battery, this charge could have been enhanced based on defendant's prior record to the same five (5) year prison sentence that defendant had turned down as a plea offer."  *Id.*  The court found neither attorney error nor prejudice to the outcome.  *Id.*

Respondent argues that the Rule 3.850 court "did not conclude that Petitioner would have been subject to an enhanced sentence under the Prison Releasee Reoffender Act."  Doc. 5, p. 27.  The court did use the word "enhanced," and did not mention the Prison Releasee Reoffender Act, but the court held that Petitioner would have received a 5 year sentence, not something less.  A *mandatory* 5 year sentence would have been imposed only if the PRR Act applied.  FLA. STAT. § 775.082(9)(a)3.d. (5 year term for a third degree felony).  Thus, it is unclear why Respondent makes this argument.

---

[9] The conclusion is correct but the premise is incorrect.  At the time of Petitioner's offense, a battery conviction was a third degree felony only if the defendant had two or more prior battery convictions.  J.E.A. v. State, 842 So. 2d 851, 852 n.1, noting also that FLA. STAT. § 784.03(2) was amended effective July 1, 2001, to require only one prior battery conviction to result in a third degree felony for a subsequent battery.  Petitioner had two prior battery convictions.

Petitioner contends that Morris's belief, that Petitioner would have been subject to a mandatory 5 year sentence under the PRR Act if convicted of battery, was incorrect.  That enhancement, argues Petitioner, would have occurred only if Petitioner had committed an "aggravated battery," not a third degree felony battery, citing FLA. STAT. § 775.082(9)(a)1.  *Id.*, p. 12.  Petitioner further argues that once a misdemeanor battery is enhanced to a third degree felony battery, it cannot be further enhanced as a qualifying offense under FLA. STAT. § 775.082(9)(a)1(o), specifying "any felony that involves the use or threat of physical force or violence against an individual."  Cited for this without adequate explanation is Solone v. State, 686 So. 2d 719, 720 (Fla. 2d DCA 1997).  Respondent did not respond to this legal argument.

Solone is very wide of the mark.  That case involved another criminal statute and Florida's habitual offender sentencing statute.  The defendant in that case committed a robbery wearing a hood.  At the time of the offense, FLA. STAT. § 775.0845 (1991) provided that the penalty "shall be increased as provided in this section if, while committing the offense, the offender was wearing a hood, mask, or other device that concealed his identity."  In relevant part the statute provided that the penalty for a "felony of the second degree shall be punishable *as if it were* a felony of the first degree." *Id.*, § 775.0845(4) (emphasis added).  The statute was entitled "Wearing mask while committing offense; *enhanced* penalties." *Id.* (emphasis added).  A year before Solone was decided, the Florida Supreme Court had held that this statute "is a penalty enhancement statute rather than a substantive reclassification statute." Cabal v. State, 878 So. 2d 315, 318 (Fla. 1996).  As a consequence, Solone held that it was error to *reclassify* a robbery with a hood from a second degree to a first degree felony and then

to sentence the defendant as an habitual offender who had committed a first degree felony pursuant to FLA. STAT. § 775.084(4)(b)1.  686 So. 2d at 720.

In response to Cabal, FLA. STAT. § 775.0845 was amended to make clear "that the legislative intent behind the statute is not to enhance a penalty but to reclassify an offense [to] the next higher degree."  Chapter 9-39, § 1,Laws of Florida (1997).  The statute was amended to state that the offense is "reclassified" to the next higher level.

The statute at issue in this case, FLA. STAT. § 784.03(2), is not a penalty enhancing statute.  It creates a substantive offense.  It provides that whoever has the requisite number of prior battery convictions and commits a subsequent battery "*commits* a felony of the third degree."  (Emphasis added.)  "[S]ection 784.03(2) felony battery is a separate substantive offense and not a mere enhancement of the crime of battery."  Bates v. State, 825 So. 2d 1025, 1026 (Fla. 1st DCA 2002).

Souza v. State, 889 So. 2d 952 (Fla 5th DCA 2004) provides some guidance as to what is intended to be a "qualifying" offense by the PRR Act:

> [A] number of the crimes listed in the PRR Act as qualifying offenses are described in their broadest sense.  Murder, for example, is listed as one of the qualifying offenses.  There are, of course, several degrees of murder and a number of different methods of committing that crime set forth in the statutes, yet the PRR Act does not differentiate, for example, between second and third degree murder.

889 So. 2d at 956.  Thus, the court concluded that DUI manslaughter was a variety of manslaughter, and manslaughter was a qualifying offense for PRR Act sentencing.  *Id*. In other words, the general categories of qualifying offenses are intended to cover many related types.

That is especially true with respect to the qualifying offense category relevant here.  FLA. STAT. §775.082(9)(a)1.(o) provides that "[a]ny felony that involves the use or threat of physical force or violence against an individual" qualifies for PRR Act sentencing.  The trial evidence that Petitioner hit Rollins in the face and the back of the head satisfies the wording of this category.  Had Petitioner been convicted of the lesser included offense of battery, he would have committed a qualifying third degree felony battery (because he had two prior battery convictions) and he would have been sentenced to a mandatory 5 year term.  FLA. STAT. §775.082(3)(d).  The same sentence had been offered to Petitioner as a plea bargain and Petitioner rejected it.  Counsel had no reason to seek the same sentence by means of a jury instruction.  As he said, he did not want to give the jury that option; he wanted the jury to "fish or cut bait."  The Rule 3.850 court was correct that counsel did not pursue this jury instruction for strategic reasons.  There was no attorney error.

Moreover, the lack of an instruction as to battery did not prejudice the outcome. The jury was either going to believe that Rollins was trying to steal Petitioner's money or it was not.  When Petitioner yelled to Rollins that he only wanted a dollar, his earlier version of events became unbelievable.  A jury would not have convicted for the punch in the face and ignored the grabbing of the money.

Accordingly, neither attorney error nor prejudice to the outcome has been shown. Thus, Petitioner has not shown that the state court's adjudication of the merits of Petitioner's ineffectiveness claim in ground three has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Four**

Petitioner contends that he trespassed at the daycare center to avoid death or serious bodily injury at the hands of Rollins.  He contends his attorney was ineffective for failing to request a jury instruction as to the defense of necessity.  He contends he would have been acquitted of count two (the trespass charge) had the defense of necessity been presented to the jury.  The trial court rejected this claim without discussion.  Doc. 6, Ex. G, ¶ 5.

The elements of the defense of necessity are:

> . . . (1) that the defendant reasonably believed that his action was necessary to avoid an imminent threat of death or serious bodily injury to himself or others, (2) that the defendant did not intentionally or recklessly place himself in a situation in which it would be probable that he would be forced to choose the criminal conduct, (3) that there existed no other adequate means to avoid the threatened harm except the criminal conduct, (4) that the harm sought to be avoided was more egregious than the criminal conduct perpetrated to avoid it, and (5) that the defendant ceased the criminal conduct as soon as the necessity or apparent necessity for it ended.

Bozeman v. State, 714 So.2d 570, 572 (Fla. 1st DCA 1998).

Prejudice to the outcome has not been shown for much the same reasons as discussed above with respect to ground three.  After Petitioner said he had only wanted a dollar to begin with, a jury was surely going to find that the incident began when Petitioner took more than a dollar.  Thus, element two above would not have been satisfied.  Further, Petitioner intentionally placed himself in a position where he would have to run somewhere to get away with the money, and Rollins or others would probably pursue him.  A robber clearly does not enjoy the defense of necessity as to crimes committed while fleeing.

Thus, neither attorney error nor prejudice to the outcome has been shown for failure to request an instruction as to the defense of necessity.  Consequently, Petitioner has not shown that the state court's adjudication of the merits of Petitioner's ineffectiveness claim in ground four has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Five**

Petitioner contends that his attorney failed to advise him of his right to testify.  Petitioner concedes that his attorney advised him that it was not in his best interests to testify, but he contends that he was never advised that it was his decision to make.

"[A] criminal defendant has a *fundamental* constitutional right to testify in his or her own behalf at trial.  This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel."  United States v. Teague, 953 F.2d 1525, 1532 (11th Cir. 1992) (*en banc*, emphasis by the court).  Such a claim is properly brought as an ineffective assistance of counsel claim pursuant to the Strickland formula.  953 F.2d at 1534.  Defendant must also show prejudice to the outcome.  Nichols v. Butler, 953 F.2d 1550, 1553-1554 (11th Cir. 1992) (*en banc*).

As the Rule 3.850 court found, Petitioner had been asked on the record at trial whether he wanted to testify and he declined.  Doc. 6, Ex. G, ¶ 6.  This finding of fact is fully supported by the record.  Doc. 6, Ex. B, p. 171.  Petitioner told the court that he understood he had "an absolute right to testify," and he said it was his decision not to testify.  *Id.*  The Rule 3.850 court found that counsel advised Petitioner not to testify because, if he testified, the jury would have found that he had previously been convicted

of ten felonies.  Doc. 6, Ex. G, ¶ 6.  This also is fully supported by the testimony of

attorney Morris at the Rule 3.850 hearing.  Morris said he that he advised Petitioner not

to testify due to his criminal history, and Petitioner said he had been convicted of ten

felonies.

      The trial court found no prejudice "by any failure on Mr. Morris' part to prepare

defendant to testify prior to trial."  Doc. 6, Ex. G, ¶ 6.  The trial court noted that at the

Rule 3.850 hearing, Petitioner testified that the money was owned by Rollins and he

took it from him.  *Id.*  This factual finding is supported by the record discussed above.

Petitioner denied hitting Rollins, but admitted using force against Rollins (fighting) in an

effort to escape with Rollins's money.  He also said he broke free from Rollins after

hitting Rollins.

      The trial court's application of <u>Strickland</u> to these facts was not unreasonable.

Petitioner admitted in open court that he knew it was his right to testify.  He admitted

during the Rule 3.850 hearing that he knew he had the right to testify.  It can hardly be

considered attorney error to fail to talk at greater length with Petitioner about his version

of events when, at the time the decision was made, he was sticking to his unbelievable

untruth.  Attorney error is to be judged at the time of trial, not at the time of the Rule

3.850 hearing, when Petitioner had a change of heart about what really happened.

Finally, that Petitioner had ten prior felonies would have been quite damaging to his

defense had he testified.

      Further, prejudice to the outcome has not been shown, given the nature of the

expected testimony as revealed at the Rule 3.850 hearing.  Petitioner admitted he hit

Rollins to avoid being hit by Williams with the cane.  He also said that because he did

not want to be represented by Morris, he would have testified that the money was

owned by Rollins without first telling Morris that his testimony would be different from

what he had told the police.  Thus, had he testified, his version of events would have

come as a complete surprise for Morris, and it would have supported the prosecution's

case and the testimony of Rollins.

It does not matter under Florida when force is used to commit the robbery as

long as it is in the "course of the taking."  *See* Messina v. State, 728 So.2d 818, 819

(Fla. 1st DCA 1999).  *See also* Pray v. Crosby, No. 1:04cv381-MP/WCS, 2006 WL

680821, *4 (N.D. Fla. 2006).  Petitioner has not shown that the state court's adjudication

of the merits of Petitioner's ineffectiveness claim in ground five has "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States."  §

2254(d)(1).

**Ground Six**

Petitioner contends his attorney was ineffective for failing to interview or depose

Jimmie Williams, Alisa Footman, Ella Hargrett, and Curtis Norton.  It is argued in a

general fashion that the failure to investigate impeded counsel's ability to cross examine

these witnesses.  In Petitioner's memorandum, the only specific claim argued is the

failure of counsel to learn before trial that Norton would testify that Petitioner appeared

to be high or intoxicated.

The claim is facially insufficient as to testimony from Jimmie Williams, Alisa

Footman, and Ella Hargrett.  Petitioner fails to explain what they would have said or

what might have been different at trial had counsel interviewed or deposed these witnesses before trial.[10]

The trial court found that Morris testified that he was familiar with what the witnesses would say from depositions taken by Petitioner's former attorney, police reports, or interviews by himself or by his investigator.  Doc. 6, Ex. G, ¶ 7.  The court acknowledged that Morris was surprised when Norton said that Petitioner appeared to be high or intoxicated, but concluded that it "would be a pretty unusual trial where the participants did not get at least one surprise from the witnesses."  *Id.*  The court also concluded that there had been no showing that uncovering this evidence beforehand would have changed the outcome of the trial.  *Id.*

This ruling is a reasonable application of Strickland.  Petitioner did not tell his attorney before trial that he was intoxicated.  Moreover, the defense of voluntary intoxication was not a viable defense for the reasons explained above.

**Ground Seven**

Petitioner asserts that his attorney was ineffective for failing to request a self defense jury instruction and for failing to call witnesses supportive of this defense.  Petitioner points out that there was evidence that he suffered bruises and abrasions,

---

[10] "A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984).  A defendant's conclusory allegations about the testimony of witnesses are insufficient to state a claim of ineffective assistance of counsel.  *See* Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th Cir.1985), *cert. denied*, 479 U.S. 918 (1986); Bolder v. Armontrout, 921 F.2d 1359, 1363-1364 (8th Cir.1990), *cert. denied*, 502 U.S. 850 (1991); United States v. Vargas, 920 F.2d 167, 169-170 (2d Cir.1990), *cert. denied*, 502 U.S. 826 (1991).

and that Rollins had threatened him a few months earlier.  Petitioner notes cross examination of attorney Morris, arguing that Morris acknowledged the viability of the self defense argument.  The Rule 3.850 court found this claim to be not worthy of discussion.  Doc. 6, Ex. G, ¶ 5.

The claim of self defense had no foundation without testimony from Petitioner. The only witnesses to the events were Rollins, Williams, and Petitioner; Rollins and Williams testified that Petitioner hit Rollins first.  When he was arrested, Petitioner yelled to Rollins that he only wanted one dollar, demonstrating that he knew he took the money from Rollins without permission.  Without testimony from Petitioner, there was nothing in the record to show self defense.  That Petitioner had bruises and abrasions and ran from the scene was not probative of self defense because fighting with Rollins and running away with the money were entirely consistent with the prosecution's robbery theory.  Moreover, Petitioner testified at the Rule 3.850 hearing that if he had testified, he would have admitted that he took the money from Rollins.  He also admitted he hit Rollins in his efforts to get away.  As explained above, whether he hit Rollins before or after taking the money, the evidence would have been that he hit Rollins so that he could escape with the money.  The same evidence that supported a robbery conviction would have defeated a self defense theory.  Petitioner has not shown that the state court's adjudication of the merits of Petitioner's ineffectiveness claim in ground seven has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Eight**

Petitioner contends that the trial court improperly allowed the prosecution to peremptorily strike an African American juror, violating his Sixth Amendment rights. Petitioner relies upon Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Petitioner notes that the State exercised three peremptory challenges against African American jurors, but challenges only the strike of juror Hightower. Petitioner's attorney challenged the strike against Hightower, and the State proffered that it wanted to strike Hightower because he disclosed the fact of his conviction late in the jury selection process, he was confused as to the kind of crime for which he had been convicted, and he believed he had not been fairly treated.

Respondent argues that while Petitioner raised this claim on direct appeal, it was not presented as a federal claim. Respondent contends that the claim is procedurally defaulted.

On direct appeal, Petitioner relied upon Melbourne v. State, 679 So. 2d 759 (Fla. 1996). Doc. 6, Ex. D, p. 8. Melbourne applied Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), which in turn relied upon Batson v. Kentucky, and confirmed the modification of the procedures established in State v. Neil, 457 So.2d 481 (Fla. 1984). The court said it was setting forth "the following guidelines to assist courts in conforming with article I, section 16, Florida Constitution, and the equal protection provisions of our state and federal constitutions." 679 So. 2d at 764. Thus, Petitioner presented his federal claim on direct appeal. Respondent's procedural default argument is without merit.

Batson held that in order to demonstrate a prima facie case of discriminatory strikes, the Petitioner must show that he is a member of a cognizable racial group, that the prosecutor exercised peremptory challenges to remove members of that racial group from the jury, and that the facts and other relevant circumstances raise an inference that the prosecutor did so to exclude on the basis of race.  476 U.S. at 96, 106 S.Ct. 1723.  Petitioner is entitled to rely on the fact that peremptory challenges permit discrimination by those "who are of a mind to discriminate." *Id.*, citation omitted.  In determining whether the requisite showing has been made,  the court should consider all relevant circumstances.  For example a pattern of strikes might give rise to an inference of discrimination, or questions and statements made by the prosecutor during *voir dire* might support or refute an inference of discrimination.  476 U.S. at 97, 106 S.Ct. at 1723.

Once the inference is raised, the prosecution must come forward with a neutral explanation for the peremptory strike related to the particular case to be tried, but this "need not rise to the level justifying exercise of a challenge for cause."  *Id.*, citation omitted.  The prosecution, however, does not meet this burden by stating that the members of the defendant's race will be partial because of their race, or by merely denying a discriminatory purpose.  476 U.S. at 97-98, 106 S.Ct. at 1723-24.

> The second step of this process does not demand an explanation that is persuasive, or even plausible.  "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

Purkett v. Elem, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (citation omitted).  "It is not until the *third* step that the persuasiveness of the justification

becomes relevant – the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."  *Id.* (emphasis by the Court).

Since the finding of intent to discriminate is "a pure issue of fact," it is accorded great deference.  Batson, 476 U.S. at 98, and n. 21, 106 S.Ct. at 1724, and n. 21.  That deference is now set forth in 28 U.S.C. § 2254(d)(2) and (e)(1), as amended in 1996.

> Under AEDPA, however, a federal habeas court must find the state-court conclusion "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2). Thus, a federal habeas court can only grant Collins' petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge.  State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by "clear and convincing evidence." § 2254(e)(1).

Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006).

"Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility record."  *Id.*, 126 S.Ct. at 976.

When the prosecution exercised a peremptory challenge against Mr. Hightower, the prosecutor explained that the strike was exercised because

> Mr. Hightower had a late disclosure during the jury questioning that he had been previously convicted, he said, of a misdemeanor, then later in the questioning said he was put on five years probation.  Obviously he couldn't have been put on five years probation for a misdemeanor.
>
> He also said he did not feel he was treated fairly during that case, and again, that was a late disclosure . . . .

Doc. 6, Ex. C, pp. 101-102.  These were race neutral reasons for striking Mr. Hightower and satisfied the prosecution's burden of production at step 2 of the Batson analysis.

The burden of proof remained on Petitioner.  Petitioner's only argument to prove that Mr. Hightower was struck due to his race was that with the Hightower strike, the State had exercised three peremptory challenges against African Americans.  *Id.*, p. 102.  The prosecutor responded that three African Americans had already been seated as jurors.  *Id.*  The court found that the strike was supported by responses from Mr. Hightower and was not racially motivated.  *Id.*, pp. 102-103.

Petitioner has not shown that these findings were unreasonable, based upon the record.  Ground eight, therefore, is without merit.

**Conclusion**

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Aundra Peterson challenging convictions for robbery and trespass in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 1999-CF-227A, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on February 12, 2007.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**